IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JALEEL MCFADDEN,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| **v.** | : | |
| **WHOLE FOODS MARKET** | : | |
| **GROUP, INC.** *et al.*, | : | **No. 19-1103** |
| *Defendants* | : | |

## MEMORANDUM

PRATTER, J.                                                FEBRUARY 24, 2021

Plaintiff Jaleel McFadden worked at Whole Foods as an Assistant Store Team Leader for 11 years but was never promoted to "Store Team Leader." He argues that during that time, less qualified white employees were promoted ahead of him due to a policy called the "tap." This unwritten policy allegedly required that Assistant Store Team Leaders receive the permission of their supervisor to apply for the Store Team Leader position. Mr. McFadden also argues that this policy gave Store Team Leaders "license to allow their conscious and subconscious biases to dictate the process." While he was eventually promoted, the promotion did not come until after he had filed a complaint for discrimination with the EEOC.

Whole Foods has moved for summary judgment on Mr. McFadden's disparate treatment and disparate impact claims. For the reasons that follow, the Court will grant the motion in part and deny it in part.

### BACKGROUND

#### I.    Whole Foods's Organizational Structure

Whole Foods is a nationwide chain of grocery stores. (Doc. No. 35-19 ¶ 1.) Like many companies, Whole Foods has a hierarchical structure and is divided into many different regions. Mr. McFadden has worked only at stores within the Mid-Atlantic Region ("MA Region").

1

Regional leadership is divided into three levels of hierarchy: the Regional President, the Regional Vice-President, and the Executive Leaders of Operations. *Id.* ¶¶ 5-6. Scott Allshouse is currently the Regional President of the MA Region. *Id.* ¶ 5. David Pinkney was an Executive Leader of Operations in the MA Region during most of the events at issue in this case.[1] *Id.* ¶ 6-7. Travis Phaup became an Executive Leader in September 2017. *See id.* ¶ 6.b. Regional leadership oversees the stores within the applicable region.

While the number of stores has changed over time, there were 54 stores in the MA Region at the time of Mr. McFadden's deposition. *Id.* ¶ 90. Within each store, as a testament to any business school management instructor-trainee, there are five levels of hierarchy. At the top of the pyramid is the Store Team Leader ("STL"), who manages that store and reports to regional leadership. *See id.* ¶¶ 3-4. The second level of hierarchy is the Assistant Store Team Leaders ("ASTLs") who report to the STL. *See id.* at ¶¶ 3-4. While there is only one STL, there is usually two or three ASTLs who support the STL. *Id.* ¶ 4. The third and fourth level of hierarchy are Team Leaders ("TLs") and Assistant Team Leaders ("ATLs"), respectively. *Id.* ¶ 3. The remaining store employees are known simply as Team Members ("TMs"). *Id.* The Court has not been informed of any category lower on the organization chart.

## II.    Mr. McFadden's Career at Whole Foods

Mr. McFadden began as a TM in the Wynnewood Bakery Department in 1997.[2] (Doc. No. 35-19 ¶ 11.) Skipping the ATL status, he was promoted to TL in 2000, and he stayed in that

---

[1]    In the parallel case of *Redley v. Whole Foods Market Group, Inc.*, the Plaintiff also states that Joe Greenlee was another Executive Leader, but that fact is not contained in either party's Statement of Undisputed Facts for this case. *See Redley v. Whole Foods Market Group, Inc.*, No. 19-2908, Doc. No. 28-5 ¶ 6.

[2]    Defendants argue—and McFadden does not contest—that the statute of limitations bars claims for conduct before March 1, 2014. The Court includes facts from before that date only as background.

position for the next six years. (Doc. No. 32-5 at 73.) Mr. McFadden's team won the All-Star award in 2007. *Id.* at 69. In recognition of this success, Mr. McFadden's STL Jack Hall encouraged Mr. McFadden to apply for the ASTL position at Jenkintown. *Id.* Mr. McFadden did so successfully. *See id.* at 73. He continued to work as an ASTL until October 2018.

While Mr. McFadden worked as an ASTL for about 11 years, he did not stay at Jenkintown that entire time. Rather, he was repeatedly "swapped" to other stores. The purpose of these swaps is to educate ASTLs and to hopefully stop them from stagnating in their positions. (Doc. No. 35-19 ¶ 22.) Mr. McFadden worked as an ASTL at Jenkintown from 2007-10, at South Street from 2010-13, at Glen Mills from 2013-16, and at Callowhill/Philadelphia Center City[3] from 2016-18. (Doc. No. 32-17 at 2; Doc. No. 35-19 at 1-44; Doc. No. 32-5 at 106-07.)

As discussed in greater detail below, Mr. McFadden alleges that he repeatedly asked to be promoted to STL during this time, only to see less experienced and less qualified candidates hired for that position. Accordingly, on March 1, 2018, Mr. McFadden filed an EEOC Charge of Discrimination, alleging race discrimination. (Doc. No. 32-5 at 286.) He then sent an email to Laurent Dallot, Travis Phaup, and others, notifying them of his complaint. (Doc. No. 40 at 33-34.)

After filing his complaint, Mr. McFadden continued to express his interest in being hired as an STL. His supervisor, Mr. Dallot, encouraged him to apply to be an STL at the Plymouth location, and Mr. McFadden did so. (Doc. No. 32-5 at 242; Doc. No. 32-18 at 5.) After submitting a written application, Mr. McFadden was interviewed by a selection panel. (Doc. No. 35-19 at 40.) The panel considered three other candidates as well: Anthony Redley, Megan Murtha, and Kevin Paoletti. (Doc. No. 35-19 ¶ 99.) The panel recommended Mr. McFadden and Mr. Pinkney,

---

[3]     The Callowhill store was relocated to Philadelphia Center City shortly after Mr. McFadden began working there, and he helped open the new Center City location. (Doc. No. 32-5 at 107.)

3

either on his own or in consultation with Scott Allshouse, decided to hire Mr. McFadden. *Id.* Mr. McFadden has continued to work as an STL at Plymouth since that time.

## III.   Mr. McFadden's Efforts at Promotion

The parties dispute back and forth how much effort Mr. McFadden took throughout this time period to be promoted. Defendants argue that between 2007 and 2018, he only "sought" an STL position by waiting for the "tap," and that he did not actually ask or apply for STL positions. (Doc. No. 35-19 ¶ 78.) Mr. McFadden disagrees, and says that he sought promotion during this period in at least four different ways: (1) entering into the ASTL program which he argues was treated by Whole Foods as a tacit request for an STL position in the future; (2) by asking his various supervisors for permission to formally apply for STL positions; (3) by speaking to Mr. Pinkney about STL positions; and (4) by filing an EEOC Charge of Discrimination complaint. *Id.* ¶¶ 78-79. In contrast, Whole Foods argues that he applied for, at most, three STL positions before he applied for the Plymouth Meeting STL position. *Id.* ¶ 89. Mr. McFadden responds that he spoke to Nancy Lowell and Dale Stirzel about two STL positions, to Laruent Dallot about another two, to John Frei about two, and David Pinkney about all the above STL positions as well as others. *Id.* Mr. McFadden testified that he spoke with Ms. Lowell about the STL position at North Wales, and he believed that he spoke with Mr. Stirzel about an STL position at Devon. *Id.* ¶ 84. Mr. McFadden also testified that he did *not* talk to Mr. Dallot about the STL position at Marlton, but only because Mr. Dallot proactively told him that he was supporting Joe Anselmi instead. (Doc. No. 32-5 at 268.) Mr. McFadden testified that he told Mr. Frei that he wanted to apply for the Marlton STL position, but Mr. Frei said he wanted to see Mr. McFadden grow more before he gave Mr. McFadden his support. (Doc. No. 40 ¶ 40.) Mr. McFadden also testified that Mr. Frei told him that he "should not approach [Mr. Frei] so aggressively" about an STL position. *Id.* Mr. Frei testified that he could not recall any conversations with Mr. McFadden regarding STL

4

positions while Mr. McFadden worked at Glenn Mills, and did not recall telling Mr. McFadden to be less aggressive. *Id.* ¶ 38. Instead, Mr. Frei stated that he told David Pinkney that he supported Ms. Youngflesh for the position. *Id.* ¶ 46. About this time, Mr. McFadden testified that he asked Mr. Frei to support him for an STL position in North Wales. (Doc. No. 40 ¶ 47.) Mr. Frei responded something to the effect that "Dawn [Youngflesh] was going to apply for that . . . position." (Doc. No. 40 ¶ 47.) Carter Quigg also applied for and received the North Wales STL position, while Ms. Youngflesh received the Glenn Mills position. (Doc. No. 32-5 at 262-63.)

Mr. McFadden spoke with both Mr. Pinkney and John Frei about the Philadelphia Center City position. *Id.* at 261-63. But once the verbal dust settles it appears that Whole Foods is correct that Mr. McFadden later stated that he had asked for support in pursuing an STL position three times at most, and, therefore, Mr. McFadden inquired with his STL for three or four positions, depending on whether one counts Mr. Dallot's preemptive refusal for the Marlton position. *See id.* at 306.

## IV.    The Dispute Over Whole Foods's Promotion Policy

The parties also dispute how Whole Foods considers individuals for promotions, and what it means for an interested party to "apply" for a position.

Whole Foods has a General Information Guide ("GIG Policy"), which includes information about promotions. It states that employees who wish for a promotion should first let their TL or STL know of their interest, either informally or during job dialogues. *Redley v. Whole Foods*, 19-2908, Doc. No. 28-5 ¶ 114.[4] It also encourages employees to "[w]atch the Career Center and apply for positions as they become available." *Id.* ¶ 115. It lists eight factors that will be considered for promotions: "current job performance, knowledge of our culture and business, interest in learning

---

[4] Hereafter, citations to entries on the docket for *Redley v. Whole Foods*, 19-2908 will be preceded by "*Redley*,".

about store/facility operations, merchandising, products and health related issues; applicable background in the field of interest; respect of your peers and of course, self-motivation." *Id.* ¶ 116. Finally, it states that the ultimate choice for how to fill a position lies with the STL, who "may consult with the Regional President and/or other leaders." *Id.* ¶ 117. Mr. Redley testified that he was aware of the GIG policy and knew that team members were encouraged to tell their TL or STL if they were interested in a position. *Id.* ¶ 118.

Whole Foods argues that Mr. Redley and Mr. McFadden described different promotion policies. Mr. McFadden stated that an employee either could ask an STL for support in the quest for a promotion, or the employee would get "tapped." In other words, Mr. McFadden stated that an employee needed their STL's support, but could be proactive in seeking that support. *Id.* ¶ 120.

Mr. Redley described a process as having effectively three steps. Step 1 was asking their current STL for support. *Id.* ¶ 123. Step "1A" was "getting the approval of the person that's above [that STL]," namely the Executive Leader of Operations. *Id.* Step 2 was filling the application out. *Id.* ¶ 123. But Mr. Redley elsewhere conceded that Step 2 was not always necessary, given that his own promotion to ASTL at Wynnewood "just came out of nowhere." *Id.* ¶ 122. Mr. Redley also stated that Step 1 (and perhaps 1A) could come about differently, because the "tap" could be either solicited or unsolicited. *Id.*

Mr. Dallot testified about the application process for Melissa Lesniak, who applied for several positions, and his testimony is of mixed usefulness to both parties. What is helpful to Mr. McFadden is the fact that Mr. Dallot agreed that a phone call or email would sometimes constitute an application. *See* (Doc. No. 32-9 at 54-55, 78-79, 93-95). What is helpful to Whole Foods is that Ms. Lesniak applied for and received a position in Marlboro, New Jersey even though Mr. Phaup said that he felt she should stay an ASTL for longer. *Id.* at 55-58. The person in charge

of hiring Mr. Lesniak, whose name Mr. Phaup could not remember, contacted Mr. Phaup about Ms. Lesniak's application. *Id.* at 57. Mr. Phaup shared his frank assessment of Ms. Lesniak's abilities, but did not explicitly say that he believed Ms. Lesniak was not ready. *Id.* at 58.

Mr. Dallot also testified that Michelle Landry applied for an ATL position at Philadelphia Center City without the support of her STL or TL because she "didn't get along with her team leader and she didn't feel supported." *Id.* at 258. Mr. Dallot did not testify whether Ms. Landry received that position.

Mr. Phaup and Mr. Dallot both discouraged Joseph McAleer from making a lateral move from PCC to Wynnewood because they believed he would be better off at PCC. *Id.* ¶ 56. Mr. McAleer applied anyway, and secured the position. *Id.* However, as Mr. McFadden points out, there is no evidence indicating whether Mr. McAleer was an ASTL or STL, so the relevance to Mr. McFadden's and Mr. Redley's complaints is muted. *Id.* ¶ 56.b.

Mr. Pinkney's testimony also undercuts Whole Foods's argument that a digital or written application is necessary. Whole Foods does not dispute that Mr. Pinkney testified that during his 23-year career with Whole Foods, he completed only digital or written applications. (Doc. No. 40 ¶ 69.)

Mr. Phaup testified that by around 2015, digital applications were required. (Doc. No. 40 ¶ 70.) But this testimony is at odds with Mr. Pinkney's testimony because Mr. Pinkney received a promotion in 2020 for which he did not complete a digital application. *See id.* ¶ 69. Moreover, Mr. Phaup's testimony that emails go out to employees with links to an online, digital application, is undercut by the fact that Whole Foods failed to produce any evidence of these emails with links even though the Court ordered them to do so.[5]

---

[5]      Mr. McFadden notes that Whole Foods has not produced the job bulletin postings for positions at issue between 2015 and 2018, notwithstanding this Court's Order that Whole Foods do so. (*See* Doc. No.

The parties also disagreed whether it was common for ASTLs who wanted to become STLs to relocate. Defendants cite two examples: Ms. Quigg, who relocated from New York to Philadelphia to become an STL at North Wales, and Tyson Strople who relocated from Oregon to Pennsylvania for an ASTL position. *Id.* ¶ 91. Plaintiffs respond that Ms. Quigg said she relocated for family reasons. *Id.* They do not respond to the Mr. Strople example, but in any case, he relocated for an ASTL, not an STL, position. *Id.* However, there is other support for these statements, because Mr. Redley testified that the Philadelphia region was competitive, and it would be easier to get an STL position by relocating to another area. (*See* Doc. No. 39-33 ¶¶ 194-95.)

## V.     Other Evidence of Alleged Racial Animus

McFadden stated in his declaration that he was aware of seven other current or former Whole Foods employees who complained of race discrimination: Michelle Brown, Philip Martin, Amira Miles, Desmond Shannon, Albert Jones, Angela Holden, Jasmine Thomas, and Anthony Redley. (Doc. No. 35-3 at 1.) He only offers details about Mr. Redley's accusations.

In his deposition and elsewhere, Mr. McFadden also cites incidents involving Dale Stirzel and Nancy Lowell that he says constitutes evidence of racial animus.

Mr. McFadden's allegations against Mr. Stirzel are the most extensive. He references the testimony of Mr. Redley, who testified that Cherrie Dashields and Mr. Stirzel were "fighting every day," and that Mr. Stirzel "was embarrassing her in front of team leaders." *Id.* ¶ 98. Ms. Dashields is black. She reportedly complained to Mr. Pinkney that Mr. Stirzel showed "favoritism" and, quite irrelevant to racial animus, needed to be more organized. *Id.* ¶ 97. Mr. Redley told Ms. Dashields that she needed to stop spending "extra time with team members instead of doing other things," and encouraged her that it "would be a good idea for her to do something else." *Id.* ¶¶ 99,

---

28.)  However, Mr. McFadden does not move to reopen discovery, or to again compel Whole Foods to disclose these documents, so the Court merely takes note of this discovery circumstance.

8

102. Ms. Dashields did step down from her ASTL position and became a payroll and benefits specialist with Whole Foods. *Id.* ¶ 103. Mr. Redley believed that Ms. Dashields switched roles, at least in part, because of "family reasons." *Id.* ¶ 105.

Mr. McFadden alleges that Mr. Stirzel has been sued by another employee for disability and race discrimination. (Doc. No. 40 at 41.) Mr. McFadden also noted that Mr. Stirzel did not provide support for Mr. McFadden's formal application to the STL position at Devon. (Doc. No. 35-18 at ¶ 35.)

Mr. McFadden also testified that Mr. Stirzel demoted two other black individuals: Kwame Danquah and Mike Mensah. *Id.* ¶ 107. However, Mr. Redley stated that the issue with Mr. Mensah "was some communication issues and some merchandising issues," and that Mr. Stirzel told Mr. Redley that Mr. Danquah needed "more support from us," and felt that he was an "asset to this store" who needed to be invested in to be more effective. *Id.* ¶¶ 107, 109.

Finally, Mr. McFadden points to a statement from Nancy Lowell that she made after he asked about an STL position at the North Wales Store. (Doc. No. 40 ¶ 32-34.) She allegedly responded: "You're not applying for that. You're not like them." *Id.* ¶ 33. Mr. McFadden testified that the comment was "a hurtful thing to hear," and thought that it could be a reference to his race. (Doc. No. 40 ¶ 34; Doc. No. 32-5 at 120.)

The Court has described the dueling factual accounts in unusual detail in part to highlight a prototype example of the nature of the record in many cases dealing with employment disputes and in part to make clear the reasons for the Court's ruling on the pending motion.

## DISCUSSION

Mr. McFadden brings two claims under Title VII: disparate treatment and disparate impact.[6] The Court will discuss each in turn.

### I.  Disparate Treatment

Under the *McDonnell Douglas* burden-shifting framework, a claim advances in three stages. First, a plaintiff must plead a prima facie case of discrimination. *Jones v. School Dist.*, 198 F.3d 403, 410 (3d Cir. 1999). If the plaintiff does so, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

The parties do not contest that Defendants have satisfied the second element: articulating a legitimate, non-discriminatory reason for rejecting Mr. McFadden until 2018. Thus, the question is whether McFadden can meet the first and third elements: his prima facie case, and pretext.

#### A.  *Prima Facie* Case

A plaintiff must show four things to establish a prima facie case of disparate treatment: (1) that the plaintiff is a member of a protected class; (2) plaintiff applied for and was qualified for the job; (3) plaintiff was rejected; and (4) the adverse action occurred under circumstances that would give rise to an inference of discrimination. *See Young v. Pennsauken Twp. Sch. Dist.*, 47 F. App'x

---

[6]      While Mr. McFadden also brings claims under 42 U.S.C. § 1981, the Pennsylvania Human Relations Act ("PHRA"), and the Pennsylvania Fair Practices Ordinance ("PFPO"), these claims are derivative of his two Title VII claims. Thus, to the extent that the Court grants Whole Foods's motion for summary judgment as to Mr. McFadden's Title VII claims, the Court also grants summary judgment as to his parallel claims under § 1981, the PHRA, and the PFPO.

160, 161 (3d Cir. 2002). Whole Foods does not contest that Mr. McFadden was a member of a protected class, or that he was rejected for the positions to which he applied. Thus, Mr. McFadden must show that he (i) applied for at least one job for which he (ii) was qualified and (iii) was rejected under circumstances giving rise to an inference of discrimination to establish a prima facie case.

### i.   Applied for

There is both a legal and factual dispute over whether Mr. McFadden meets this element. The legal issue arises because courts generally and logically require that plaintiffs have applied for a position before they may sue for failure to be hired or promoted to that position. *See, e.g.*, *Petrosino v. Bell Atl.*, 385 F.3d 210, 226-27 (2d Cir. 2004); *Williams v. Hevi-Duty Elec. Co.*, 819 F.2d 620, 629 (6th Cir. 1987) (where company had a policy of only considering written applications, it was error for the District Court to find that plaintiff's obvious desire to be hired constituted an "application"). Some courts have stated that the "formal" application requirement can only be relaxed where the position was never posted. *See Petrosino*, 385 F.3d at 226-27. Here, the position was posted, but Mr. McFadden's argument is that even when positions were posted, applications were often handled informally and Whole Foods did not solicit "formal" paper or digital applications.

While there is some dicta arguably to the contrary (see *Williams* and *Petrosino*), most courts have concluded that what constitutes an "application" is a question of fact. As long as the company approved of an informal application process, a plaintiff's act of engaging in that casual process satisfies the "application" element. *See, e.g.*, *Goss v. Bernier*, 2007 WL 423966, *24-25 (S.D.N.Y. Feb. 17, 2007) (finding that the informal application process followed by the plaintiff was sufficient because it was condoned by the defendant); *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 267 (E.D.N.Y. 2013) (formal application not required where there was no formal

posting and employee applied through the informal procedures suggested by the employer). Similarly, the Third Circuit has held that "failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer." *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 349 (3d Cir. 1990). *See also Newark Branch, NAACP v. Town of Harrison*, 907 F.2d 1408, 1414 (3d Cir. 990) (formal application not required if plaintiff "would have applied but for" the discriminatory practice or that he "reasonably believed that a formal application would be futile"); *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977) (formal application not required if it would be a "futile gesture"). Accordingly, the present inquiry is a factual one; namely, what was Whole Foods's application process during the relevant time period, and did Mr. McFadden engage that process?

Viewed through this lens, it is clear that there remain disputed issues of material fact. It is true, as Whole Foods says, that the Whole Foods employee handbook required interested parties to "apply." But the record is replete with testimony that Whole Foods did not always require a written or digital application, as some of Whole Foods's witnesses themselves conceded. For example, Mr. Redley (himself a plaintiff in parallel litigation with Whole Foods) testified that (perhaps not in the absence of self-interest) when he applied without his supervisor's support, his application was removed from the system. (*Redley*, Doc. No. 39-10 at 58-60.) Perhaps a more objective account comes from, David Pinkney who testified that he held multiple STL positions during his 23-year career with Whole Foods, yet he only completed one digital or written application, and he did not receive that position. (Doc. No. 40 ¶ 69.) In other words, Mr. Pinkney never filled out a digital or written application for the positions that he was selected for.

Construing this information in the light most favorable to the Mr. McFadden, the Court finds that he has satisfied this element of his prima facie case.

### ii.   Qualified

The standard for proving that one was qualified for the job is not hard to meet. A plaintiff need only show that he or she "would realistically have been in the running for the job absent the alleged discrimination," *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994), looking only at the objective qualifications for the job, *see Scheidemantle v. Slippery Rock Univ.*, 470 F.3d 535, 540-42 (3d Cir. 2006). In other words, at this stage courts inquire "only into the bare minimum requirement necessary to perform the job at issue." *Makky v. Chertoff*, 541 F.3d 205, 215 (3d Cir. 2008).

Whole Foods's brief largely misses the point on this issue. Whole Foods details the criteria that it considered for hiring STLs: "1) organization; 2) knowledge of financials; 3) holding subordinates accountable; 4) merchandising and store operations; 5) follow through to complete tasks by certain deadlines; 6) preparation; 7) maintaining store cleanliness; and 8) listening." (Doc. No. 32-2 at 17.) Pointing to a history of alleged performance deficiencies detailed in annual "Job Dialogues," Whole Foods argues that Mr. McFadden was not qualified. But all of these criteria are subjective, with the possible exception of meeting deadlines. On that point, Whole Foods argues that according to Mr. Pinkney's testimony, "a candidate's organizational skills are assessed by their ability to meet project deadlines." (Doc. No. 40 ¶ 79.) And deadlines, they argue, are objective. *See id.* Even if this were the case—and Whole Foods offers no evidence of what deadlines Mr. McFadden allegedly missed—the way that this factor was weighed against the others in deciding qualifications is still subjective.

Instead, the only truly "objective" criterion appears to be the requirements that STLs have "3 Plus Years of Store Leadership." *Id.* For all of the times at issue in this case, Mr. McFadden

had three years of experience as an ASTL, which was the highest level of seniority below STL. Therefore, Mr. McFadden has made out this element of his prima facie case.

> ### iii.   Circumstances giving rise to an inference of discrimination

A plaintiff may show circumstances giving rise to an inference of discrimination with any kind of relevant evidence, including "comparator evidence, evidence of similar racial discrimination against other employees, or direct evidence of discrimination from statements or actions by [the plaintiff's] supervisors suggesting racial animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010). To make out his prima facie case of discrimination, Mr. McFadden principally relies on comparator evidence:[7] "evidence that defendant treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff." *Darby v. Temple Univ.*, 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)).

Mr. McFadden gives no specific comparator evidence. (*See* Doc. No. 35 at 23-27.) Instead, he states generally that the question of who is an adequate comparator is a question of fact. This is correct, but does not absolve him from pointing to specific comparators showing that there is at least one comparator whose relevancy is in dispute. Ordinarily this would be grounds for rejecting Mr. McFadden's argument. However, closely reading through the parties' statements of uncontested facts, the Court is able to identify three possible comparators.

The first is Dawn Youngflesh. Mr. McFadden testified that he asked Mr. Frei if he would support Mr. McFadden in applying for the STL position at Marlton, which Mr. McFadden learned

---

[7]    Mr. McFadden also argues that comparator evidence is not required, and that his prima facie case is also made by pointing to Mr. Redley's case, which alleges similar discrimination. (*See McFadden*, Doc. No. 35 at 19-20.) Mr. Redley makes the same argument in reverse, citing Mr. McFadden's case. (*See Redley*, Doc. No. 39-2 at 27.) Because the Court finds that Mr. McFadden has met his burden through comparator evidence, the Court need not decide whether two plaintiffs simultaneously alleging similar mistreatment can successfully "bootstrap" each other's prima facie cases.

was open. (Doc. No. 40 ¶ 38.) Mr. McFadden testified that Mr. Frei told him that he "shouldn't come at it so aggressively like that." *Id.* ¶¶ 38-40. Instead, Mr. Frei supported Dawn Youngflesh for the position. *Id.* ¶ 45. Ms. Youngflesh was Mr. McFadden's co-ASTL, and both of them met the only objective qualification that the Court can consider at this stage: the 3-year "leadership" requirement.    Mr. Frei stated that his reason for supporting Ms. Youngflesh is that she "demonstrated a lot of the skills that would be required to become a store leader." *Id.* ¶ 45. Although Ms. Youngflesh did not receive the Marlton position, shortly thereafter, an STL position opened at the North Wales store, and Mr. Frei again supported Ms. Youngflesh. *Id.* ¶ 49. Mr. McFadden testified that both Mr. Frei and Nancy Lowell refused to support him for the North Wales spot. *Id.* ¶ 33, 47-48. Ms. Youngflesh secured the North Wales STL position.

The second possible comparator is Joe Anselmi, a white man who Mr. McFadden alleges received better treatment. Mr. McFadden's supervisor at the time was Laurent Dallot. Another STL position at Marlton had opened up, and Mr. McFadden was interested in the position. (Doc. No. 40 at 23.) But before Mr. McFadden had the opportunity to discuss the position with Mr. Dallot, Mr. Dallot let him know that he was supporting Mr. Anselmi for the position. *Id.* at 24. Mr. Anselmi did not receive the position. Near the end of that same year, an STL position opened up again at South Street, and Mr. McFadden asked for Mr. Dallot's support. *Id.* Mr. Dallot refused, and again supported Mr. Anselmi even though Mr. Anselmi was in a "corrective action" status at the time. *Id.* Mr. Anselmi won the position. *Id.* at 25-26. (Doc. No. 40 at 25-26; Doc. No. 35-19 ¶ 159.)

The third possible comparator is John Frei. Mr. McFadden notes in his statement of facts that he had once been Mr. Frei's mentor and that Mr. Frei had less experience than him, but Mr.

Frei became STL at Glen Mills. (Doc. No. 35-19 ¶¶ 25-26.) Mr. McFadden was then supposed to "mentor under" his former subordinate. *See id.*

A reasonable juror could find that these three events show that white employees seeking promotions received better treatment than Mr. McFadden. *See, e.g.*, *Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014) ("Whether comparators are similarly situated is generally a question of fact for the jury.").[8] Accordingly, Mr. McFadden has sufficient comparator evidence to meet his prima facie burden.

Finally, even supposing that this comparator evidence was insufficient, a plaintiff can make out a prima facie case with the same evidence used to demonstrate pretext. *See, e.g.*, *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014) ("Although evidence of pretext is normally considered at the last step of the *McDonnell Douglas* analysis, pretext can also satisfy the inference-of-discrimination element of the prima-facie case."). Because, as noted in the following section, Mr. McFadden has produced enough evidence that a jury could find that Whole Foods's proffered reasons are pretextual, he has made out a prima facie case of discrimination.

---

[8]     Whole Foods notes in passing that Mr. McFadden did not have the same supervisor or manager as did some of these comparators. (Doc. No. 32-3 at 19.) But evidence "concerning purported comparators with different supervisors is neither per se admissible nor per se inadmissible." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009). Rather, such "[q]uestions of relevance and prejudice are for the District Court to determine in the first instance." *Id.* (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008)). Notwithstanding the fact that Mr. McFadden had different supervisors than some of the white employees who received STL positions more quickly, the evidence shows that employees were often (indeed usually) hired as an STL into a store other than the store where they previously worked as an ASTL or STL. (*See* Doc. No. 32-9 at 56-57 (other Whole Foods regions used the same hiring methods as MA North); *id.* at 57-58 (Ms. Lesniak was hired into Marlboro, NJ store from a store in a different region)). Whole Foods also treated employees as a part of the same "pool" of employees, as evidenced by the fact that they would "swap" ASTLs to different stores to prevent them from becoming stagnant in one position. (Doc. No. 35-19 ¶ 22.) (*See also Redley* Doc. No. 25-1 at 16 ("[A] candidate for [an STL] position could come from any store in the United States to fill the position.")) Because these employees were all a part of the same "pool" and were hired according to the same objective qualifications, it is for the jury to decide whether these comparators were sufficiently similarly situated to give rise to an inference of discrimination.

## B. Pretext

After the plaintiff has made out a prima facie case of disparate treatment, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Jones v. School Dist.*, 198 F.3d 403, 410 (3d Cir. 2014). Plaintiff does not contest that Whole Foods has articulated nondiscriminatory reasons for rejecting Mr. McFadden. Those reasons are (a) that Mr. McFadden was not qualified because he had negative reviews, and (b) that he never applied to these positions. Mr. McFadden argues that both of these reasons are pretextual, and that Whole Foods's reasons for not promoting him have shifted over time.

### i.   *Defendant's proffered reasons are arguably pretextual*
#### a.   *Performance reviews and corrective action*

Whole Foods argued that one reason Mr. McFadden did not achieve an STL position sooner than he did is that he had received a corrective action. (*See* Doc. No. 32-2 at 20 n.6; Doc. No. 32-3 ¶ 154.) Specifically, Whole Foods notes that Mr. Frei stated that the reason he supported Ms. Youngflesh instead of Mr. McFadden is only that Mr. McFadden had received a corrective action. *Id.* But another of Mr. McFadden's supervisors, Mr. Dallot, supported Mr. Anselmi instead of Mr. McFadden even though Mr. Anselmi had received a corrective action within the last 18 months. (Doc. No. 35-19 ¶ 159; Doc. No. 32-30.) Mr. Anselmi is outside of the protected class, and it is a question for the jury whether his superior treatment in the face of a corrective action shows that Whole Foods's "corrective action" reason for not promoting Mr. McFadden was pretextual.

Defendants also point to Mr. McFadden's negative reviews that did not result in a corrective action. But as discussed above, Mr. McFadden disputes Whole Foods's characterization of these reviews. He argues that the vast majority of his reviews were positive. The Court has read through the exhibits cited by both parties, and notes that there is ample evidence to support

either party's characterization of the performance reviews. But construing the evidence in the light most favorable to Mr. McFadden, as the Court must, these reviews were positive, and a reasonable jury could find that this proffered reason is pretextual.

### b. Whether McFadden applied

Whole Foods's next proffered reason is that Mr. McFadden was not promoted to STL because he did not apply for the job. For the same reasons discussed above related to the first prong of Mr. McFadden's prima facie case, Mr. McFadden has done enough to carry his burden on this issue.

### i. Whole Foods's changing account of the decisionmakers

Mr. McFadden also points out a contradiction in Whole Foods's briefing as evidence of pretext. Throughout most of its motion, Whole Foods argues that STLs played no role in deciding whether their employees could apply to outside positions. But in the comparator evidence section, they argue that Mr. McFadden is not similarly situated to Ms. Quigg because the two of them never worked under the same supervisor. As Mr. McFadden points out, this distinction would only matter if STLs did indeed play a role in determining whether an employee could apply to a different position. This shifting account is an independent reason to deny Whole Foods's motion. *See, e.g.*, *Cullen v. Select Med. Corp.*, 779 F. App'x 929, 932 (3d Cir. 2019) (plaintiff had demonstrated pretext where the defendant "offered inconsistent explanations").

## II.     Disparate Impact

A disparate impact claim does not require any evidence of the Defendant's motive. Rather, Title VII outlaws "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities." *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). To prevail, a plaintiff must point to a "specific employment practice [that is] facially neutral," that has

18

a "significantly discriminatory impact." *Crawford v. Verizon Pa., Inc.*, 103 F. Supp. 3d 597, 608 (E.D. Pa. 2015). A plaintiff must offer statistical evidence "'of a kind and degree sufficient to show that the policy or practice in question' caused the disparate impact." *Id.* at 608 (quoting *Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 299 (3d Cir. 2014)).

As noted above with regards to Mr. McFadden's prima facie case for disparate treatment, there is a dispute of fact as to whether Whole Foods had a policy that employees would only be considered for a promotion if they were "tapped." Mr. McFadden argues that while this policy of requiring supervisor support is facially neutral, it gives STLs "license to allow their conscious and subconscious biases to dictate the process." (Doc. No. 35 at 40.) Accordingly, Mr. McFadden has met his burden of pointing to a specific employment practice that is facially neutral.

However, Mr. McFadden has not come forward with sufficient statistical evidence to support his claim that this "tap" policy created a disparate impact. In order to make the statistical link between the practice and the racially unequal result, courts require "statistical analysis or expert [testimony]." *Crawford*, 103 F. Supp. 3d at 609. For example, the court in *Crawford* dismissed a plaintiff's Title VII racial disparate impact claim because he could only point to "data concerning six individuals." *Id.*

The Court puts to one side the parties' dispute over whether the MAN Metro (Philadelphia) or MA North region is the appropriate scope for statistical analysis. Even assuming that the proper scope of analysis is the MAN Metro region, as Mr. McFadden urges, Mr. McFadden's statistical evidence falls well short of the proof required. Indeed, his statistical evidence is far sparser than that in *Crawford*. He limits his entire statistical analysis to one sentence: "[Mr. McFadden and Mr. Redley] were the only two (2) Black ASTLs in the entire MAN Metro region." But

Mr. McFadden does not even include in his briefing how many ASTLs there were in total in the MAN Metro during this time.

Ironically, it is Whole Foods that fills in the statistical evidence somewhat, pointing out that Mr. McFadden alleges in his complaint that there were 20 ASTLs at the time that Mr. McFadden filed his EEOC complaint, which means that there 10% of ASTLs were black. Today, there are three black ASTLs which would seem to increase the percentage to 15%. (Doc. No. 39 at 14.)

Even if the Court was inclined to allow Mr. McFadden to benefit from the briefing of Whole Foods, this statistical evidence is also insufficient for the issue at hand. Mr. McFadden offers no statistical or expert evidence to show whether these numbers are evidence of discrimination. If the percentage of black Whole Foods employees in the MAN Metro region tracks the national percentage, then it would be expected that 10-15% of ASTLs are black. If the percentage of black Whole Foods TMs in the MAN Metro region is much higher than the national average, the fact that only 10-15% of supervisors were black may be evidence of discrimination.

But even if Mr. McFadden could demonstrate that the percentage of black ASTLs within the MAN Metro region is far below the percentage of black Whole Foods employees as a whole, that would still not be enough as a matter of necessary evidence. He would still have to demonstrate that this statistical disparity was *caused by* the discriminatory "tap" policy. "[P]laintiff's burden under the disparate impact analysis 'goes beyond the need to show statistical disparities in the employer's work force.'" *Spence v. City of Phila.*, No. CIV.A.03-CV-3051, 2004 WL 1576631, at *7 (E.D. Pa. July 1, 2004), *aff'd on other grounds,* 147 F. App'x 289 (3d Cir. 2005) (quoting *Watson v. Fort Worth Bank & Tr.,* 487 U.S. 977, 994 (1988)). Rather, "[p]laintiff must show 'a causal connection between the challenged policy . . . and a racially unequal result.'"

*Id.* (quoting *EEOC v. Greyhound Lines,* 635 F.2d 188, 193 (3d Cir. 1980)).   Because Mr. McFadden has shown neither a statistical disparity nor a causal connection, the Court will grant Whole Foods's motion for summary judgment as to his disparate impact claim.

CONCLUSION

For the foregoing reasons, Whole Foods's motion for summary judgment is granted in part and denied in part.   An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**